**BRUNSWICK–BALKE–COLLENDER CO. v. AMERICAN BOWLING & BILLIARD CORPORATION.**

No. 71.

Circuit Court of Appeals, Second Circuit.

April 10, 1945.

On Rehearing June 11, 1945.

Writ of Certiorari Denied Oct. 22, 1945.

See 66 S.Ct. 99.

Harry W. Lindsey, Jr., of Chicago, Ill., Theodore S. Kenyon, of New York City, and Leo F. Tierney, Raymond J. Friend, Walter D. Roston, and Carl Meyer, all of Chicago, Ill., for plaintiff-appellant.

Gluck & Breitenfeld and Samuel E. Darby, Jr., all of New York City (Benedict Ginsberg, William S. Gluck, and Walter A. Darby, all of New York City, of counsel), for defendant-appellant.

Before EVANS, FRANK, and CLARK, Circuit Judges.

FRANK, Circuit Judge.

1. *The Patent:*

Claim 1 of Hedenskoog patent No. 1,714,-310, dated August 11, 1928, discloses a device for controlling the movement of bowling-balls on return ways in bowling-alleys. The trial judge held that it was not infringed by defendant's device. Having so decided, he held that he could not consider the defense of invalidity or the counterclaim of defendant, American, which sought a declaratory judgment of invalidity.

■ He was wrong. Even without the defendant's counterclaim, to hold non-infringement did not preclude a holding of invalidity as an additional ground for decision in favor of a defendant; the public good will usually be served, in such circumstances, by finding invalidity. And to consider that issue was surely proper here, because of the counterclaim asking a declaratory judgment of invalidity. Altvater v. Freeman, 319 U.S. 359, 363, 63 S.Ct. 1115, 87 L.Ed. 1450.[1]

■ We think claim 1 of the patent invalid.[2] In Brunswick-Balke-Collender Co. v. National Billiard Supply Co.,[3] 43 U.S.P.Q. 10, it was held valid despite the Winn patent, No. 499,075, dated June 6, 1893, because the court found that Winn disclosed an inoperative structure and was not anticipatory. We do not agree. The claim in suit reads literally upon Winn, except that in Winn the dashpot actuating lever is located above the ball rather than below it as part of the rail. Without going into details, suffice it to say that, while Hedenskoog reveals some novelty, we think the novelty did not involve inventive ingenuity. Enough was taught by Winn so that, instructed thereby, a mechanic skilled in the art could easily contrive Hedenskoog's device. That Winn had never been used commercially is immaterial. Collins v. Emerson, 1 Cir., 82 F.2d 197, 201. We do not think that it was shown to be inoperative.

Moreover, there is present in this record evidence not before the court in the National Billiard Supply case: Plaintiff's expert here testified that the adjustability of the dashpot exhaust port is "a very essential feature" of the Hedenskoog structure; but neither in the patent specifications nor drawings is there shown an adjustable exhaust port; indeed the patent describes a fixed exhaust port with no means of controlling or varying its size.

As the patent is invalid, we do not consider the issue of infringement.

2. *The trademark and unfair competition:*

A majority of the court holds on the following basis, that the defendant infringed plaintiff's trademark:

■ Plaintiff's registered trademark is applied to bowling pins. It "consists of a crown device in red, painted or otherwise impressed around the neck of the pin." Defendant's mark was also located at the neck of the pin, was red in color, but consisted of adjacent, touching diamonds, instead of the connected triangular-half-diamond, of the plaintiff. Plaintiff began the use of its mark in 1933 and widely advertised it. It has sold over ten million of its pins so labeled. Defendant adopted its use of the connected red band of diamonds in 1938. There was evidence that at a distance of 60 to 65 feet, the two bands appeared similar. Plaintiff's band was on its two top grade pins. These pins sold at higher prices than those of defendant's. The two marks seem to the majority of the court to be confusingly similar. The identity of color, of location on the pin, of the upper half of the mark—all substantiate the trial court's

---

[1] Cf. Airolite Co. v. Fiedler, 2 Cir., 147 F.2d 496. There we held that there was no infringement and also that the patent was invalid.

[2] Although defendant's counterclaim asserts the invalidity of the entire patent, in its brief here the defendant asked only "the invalidation of claim 1."

[3] Oral opinion.

finding: "We find, the defendant's device confusingly like the plaintiff's mark. The defendant's officers knew it might be thought so when they selected it. There was evidence that their composition of it was not only knowing but intended to create similarity but we decline to find the latter." Defendant contends that there could be no confusion between the pins because the pins came in boxes with the respective maker's names clearly on them; that since there was no confusion there could be no infringement; and that no evidence of actual deception was presented.

Upon all the evidence, with all the possible conflicting inferences, the majority of the court feels required to accept the district court's findings on this disputed fact issue. Indeed the majority considers that finding the correct view of the evidence, believing it in fact impossible to conclude other than that defendant adopted its mark because of its similarity to plaintiff's, which was used so extensively on plaintiff's pins.

On this issue I dissent. I think, that, for the following reasons, defendant did not infringe: It is clear, I think, that the purchasers of pins, who are the owners of bowling-alleys, are not confused, for they see the pins at close range where they are clearly distinguishable. I shall assume, purely arguendo, that confusion of users of bowling-alleys, who are not purchasers of pins, would be sufficient to show infringement. But the record evidence shows that in fact they are not confused or likely to be: The ordinary bowler, so the evidence shows, has no preference for Brunswick's pins. He sees the pins only at the end of the alley, a distance of 60 to 65 feet. At that distance, he cannot distinguish Brunswick's from American's marking. A relatively small fraction of bowlers demand Brunswick pins; the only evidence on the subject in the record indicates that such bowlers insist on inspection to ascertain that their demands are satisfied. The evidence, therefore, discloses neither confusion nor likelihood of confusion. It fol-

lows that the mark, if valid, was not infringed. By the same token, I should hold that there was no unfair competition.[4]

*3. The Clayton Act violations:*

The Federal Trade Commission, on December 7, 1942, in a proceeding against Brunswick, entered a cease and desist order. The Commission, in findings of fact and conclusions of law, held that Brunswick had violated § 3 of the Clayton Act, 15 U.S.C.A. § 14, by the following conduct: Brunswick had organized a promotional plan, known as the "Brunswick Sweepstakes," in the years 1937 and 1938; this plan consisted of offering prizes to bowlers who entered the "Sweepstakes" and contested therein on bowling-alleys approved by Brunswick for that purpose; Brunswick approved only those alleys the proprietor of which became a subscriber to the "Sweepstakes" plan, which involved a contractual obligation by the proprietor to purchase from Brunswick four sets of its pins and $15.00 worth of bowling-alley equipment for each and every alley in his establishment; such purchases represent the entire equipment as needed by such proprietors for each of the years 1937 and 1938; a considerable number of such proprietors subscribed to that plan in those years.

American, in support of its counterclaim for violation of the Clayton Act, offered a certified copy of the Commission's order in evidence. The trial judge refused to admit it. The trial court erred. Section 5 of the Clayton Act, 15 U.S.C.A. § 16, provides: "A final judgment or decree rendered in any criminal prosecution or in any suit or proceeding in equity brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any suit or proceeding brought by any other party against such defendant under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: *Provided,* This section shall not apply to consent judgments or decrees entered before

---

4 I have not considered the validity of the trademark, but I have some doubt on that score. American asserts, inter alia, that the mark is used by Brunswick to distinguish grades of pins and that such use constitutes abandonment, citing Columbia Mill Co. v. Alcorn, 150 U.S. 460, 463, 14 S.Ct. 151, 37 L.Ed. 1144; Lawrence Mfg. Co. v. Tennessee Mfg. Co., 138 U.S. 537, 547, 11 S.Ct. 396, 34 L.Ed. 997; Amoskeag v. D. Trainer & Sons, 101 U.S. 51, 25 L.Ed. 993; Autoline v. Indian Refining Co., D.C., 3 F.2d 457, 464. Brunswick cites Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526; Capewell Horse Nail Co. v. Mooney, 2 Cir., 167 F. 575, affirmed 2 Cir., 172 F. 826.

any testimony has been taken." Before the Act was amended in 1938, a cease and desist order of the Federal Trade Commission did not become operative except after the entry of an enforcing decree by a Court of Appeals; the Commission's order could not then be regarded as a "judgment" or "decree" within the meaning of § 5. But now that, pursuant to the 1938 amendment,[5] a ·Commission order becomes final, unless judicial review is sought within a permitted period, such an order, if not reviewed, must be considered a "judgment" or "decree" within § 5. Here no review was sought.

The Commission's order, if admitted in evidence, would have made out a prima facie case for American; moreover there was other supporting evidence. The trial judge erred in not admitting it and in not holding that Brunswick violated the Act.

The witness Kennedy testified that the "Sweepstakes" caused a loss to American in the year 1938. He also gave contrary testimony on cross-examination. He was at one time an officer of plaintiff, then became an officer of defendant, and subsequently became again an officer of plaintiff as he was at the time of the trial. He was thus within the category of a "hostile" witness. In the circumstances, his testimony constitutes sufficient evidence of the fact of defendant's damage.

To maintain this counterclaim it was not necessary for American to show the amount of damages with particularity.[6] There should be a reference to ascertain this figure.

Since Brunswick discontinued its "Sweepstake" a very considerable time before this suit was begun and there is no evidence of a proposal to resume it, the trial judge correctly denied an injunction.[7]

■ 4. *Costs:*

The trial judge has discretion as to costs in the trial court. But as our decision changes the situation to favor defendant, the trial judge should reconsider his decision. American, of course, is entitled to costs on this appeal.

Affirmed.

CLARK, Circuit Judge (concurring).

The opinion passes upon only claim 1 of the Hedenskoog Patent No. 1,714,310, and therefore leaves the other seven claims unassailed. Since, however, it tends to leave their status somewhat ambiguous and since I believe the patent to disclose invention over the earlier Winn patent, I think it desirable to indicate my views. While I am never confident I know that worthy artisan the "mechanic skilled in the art" well enough to speak for him, it does seem to me that Winn would have taught him little and, indeed, would have given him the wrong clues entirely. I expect that had he arrived at the Hedenskoog result, it would be more in consequence of his general skill, or knowledge of other devices—a railroad switch, say, or the tracks of a toy electric train—than from what Winn disclosed. Plaintiff sued only on claim 1 of the patent, for the obvious reason that it thought that was broad enough to furnish a basis for a claim of infringement by defendant's device, which was like Winn's. To my mind, even the language of that claim, read in the light of the specifications and the drawings, hardly justifies so broad an interpretation, and I should not consider it to read directly upon the Winn patent. It describes much more than Winn's "vibratable bar that receives the impact of a rolling ball near one end" and retards the ball by being "cushioned at the opposite end by air pressure." For it first describes a stop *above* the rails on which the returning ball travels and then it adds "a member *below* said stop and mounted for movement *under the weight of the ball* for releasing said ball from said stop and permitting the further movement of said ball." (Emphasis added.) That seems to describe the device discussed below, not Winn's single-arm cushioned retarder. Hence, for my part, I should have considered the preferable conclusion to be that, construed reasonably strictly according to its sense and intent, claim 1 was not invalid, but merely not infringed here.

Since, however, the broader interpretation is possible, and other claims are clearly limited so as to support a patent, I shall not press my view. But this makes more

---

[5] 15 U.S.C.A. § 45(g).

[6] Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563–565, 51 S.Ct. 248, 75 L.Ed. 544; Package Closure Corporation v. Sealright Co., 2 Cir., 141 F.2d 972; cf. President &

Directors of the Manhattan Co. v. Kelby, 2 Cir., 147 F.2d 465.

[7] For the same reason, he correctly rejected the "unclean-hands" defense to the infringement claims.

imperative a suggestion of the difference I find between the patent as thus claimed and the Winn patent. As indicated above, the latter shows only a single device, consisting of a retarder holding back the ball by reason of the pressure cushioned at its other end. Obviously the counterpressure at the end of the retarder must be exquisitely adjusted to the forward force exerted by the ball itself, or else it will not operate automatically and with precision. If the retarder does not hold well enough, the ball will crash through to land ultimately as chance and its force direct; if it holds too well, the ball will stop on the tracks. But since the pressure of the ball varies with its speed and weight, the counterpressure should vary at least with the strength of arm of the pin boy—which shows why this device has been found inoperable when tested. The Hedenskoog device, however, has two important parts. First is the stop above the rails which completely and automatically stops each ball. Then there is the device whereby the rails drop slightly, *because of the weight of the ball,* and against the pressure of the dashpot below, to release the ball from the upper stop and allow it to roll to its place of rest, while the rails return to their position. This seems as ingenious as it was effective and automatic in practice; it appears to have taken thirty-five years for its development after Winn, with essentially nothing worth while in between; and it has therefore seemed an invention to the judges who have heretofore considered it. See the careful analysis of Judge Barnes in 43 U.S. P.Q. 10, and of Judge Clancy below, 60 U.S.P.Q. 295.[1]

The suggestion that invalidity must follow in consequence of a lack of specification of an adjustable exhaust port to the dashpot—based on the testimony of a witness for plaintiff separated from its context—seems to me unpersuasive. Thus singled out, the point assumes an importance which the obvious nature of the operation—surely within the ken of our skilled mechanic—hardly justifies. Changing air pressure by varying the size of an air opening is not novel; it was in fact completely illustrated in Winn. Further, the Hedenskoog device is shown to operate against a spring, with also the assistance of a fluid. Use of a spring, a fluid, the air, or some combination of them, to check the descent of the pivoted rails and to return them to

position after the ball has rolled off, seems easily feasible; and clearly some adjustment of the parts to the operation required must be made initially and from time to time thereafter. Detailed specification of the obvious seems unnecessary. Invention is hardly to be based, or to depend, upon varying the size of a hole to let out air. Of course, the need of such adjustment is both much less and much less continuous than in the Winn device.

EVANS, Circuit Judge (dissenting in part).

I agree with the views expressed by the majority except as to plaintiff's liability under the Clayton amendment to the Sherman Anti-Trust Act.

I believe the District Court properly excluded the order of the Federal Trade Commission. It does not fall within that portion of Section 5 of the Clayton Act quoted in the majority opinion. It seems to me the order of the Commission, final though it may be, is not the kind of an order described by said Section 5. It is not a "final judgment or decree rendered in any criminal prosecution." Neither is it a "final judgment * * * in any suit or proceeding in equity brought by or on behalf of the United States under the antitrust laws." Proper v. John Bene & Sons, D.C., 295 F. 729; Federal Trade Law and Practice, Henry Ward Beer, page 429, footnote 53.

As stated by Mr. Beer, "Under the Wheeler-Lea amendments to the F. T. C. Act, Commission orders may become final. * * * However the present finality of such orders would not have affected the decision in the Bene case because of the other criteria mentioned by the court."

Aside from these authorities it seems tolerably plain to me that the quoted portion of Section 5 of the Clayton Act does not apply to an order of the Federal Trade Commission.

It was apparently conceded by defendant in the argument before the District Court that without this evidence there was nothing upon which a finding of violation of the Clayton Act could be predicated.

Even if this decree were received in evidence, and it created a prima facie case against plaintiff, I am persuaded that the evidence, taken as a whole, conclusively overcame this prima facie case.

---

[1] No opinion for publication.

The only proof of violation of the Act is to be found in the evidence of prizes given by plaintiff to encourage an interest in the sport of bowling. Ordinarily a manufacturer of sports goods would not subject itself to liability for violating the Sherman Act or the Clayton amendment by giving prizes to encourage an interest in athletic games. And this is so even though the manufacturer limits its gifts to winners of contests which take place on alleys built by the plaintiff or to alleys where pins and bowling balls of plaintiff's make are exclusively used.

This is not unlike a case where a public-spirited citizen of Illinois, the late Governor Lowden, annually gave large sums of money, in way of prizes, to encourage dairymen to produce better and more profitable dairy cows. He limited his gifts to those who were raising a breed known as the Holstein-Friesian cattle, of which he was a breeder. He had a large farm whereon he raised this breed of cattle and sold his stock to dairy farmers.

It is not infrequent that rewards or prizes are given to encourage athletic competition. The prize may be cash or merchandise made by the donor. To hold that he and the recipients are in a combination to restrain trade or restrict competition would constitute, it seems to me, an unreasonable extension of the Clayton Act. It would be contrary to the purpose of the Act. Giving prizes to winners in athletic contests would not restrain trade. Such action would encourage athletic activities and thereby increase the volume of business in the sporting goods used in such games. For this reason, I do not think there was a violation of the Clayton Act, even though the order of the Federal Trade Commission were admissible in evidence in this case.

The Clayton Amendment, like the parent legislation, the Sherman Act, aimed at an evil which burdened the consumers. This burden grew out of the lessening of competition or price fixation by agreement or action of the dominant figures in an industry.

Competition, so much sought, is traceable to several causes. Advertisement is one and a very common stimulator used by competitors. It promotes rather than stifles competition. We may wonder sometimes whether tiresome advertising, overdone, does not disgust the prospective customer rather than animate a desire to possess. The general belief is that competition is promoted by advertisement. In any case, the Clayton Act was not intended to kill or to lessen advertisement, a competitive measure. Accepting this as a premise and further that a prize giver could not be expected to advertize a competitor's product, I conclude that the prize giving—particularly as here shown, did not supply the basis of a valid suit to recover damages for violation of the Clayton Act.

Lastly, let it be said that a prize to encourage an interest in an athletic game, if it accomplishes its purpose, benefits both the prize-giver and his competitor.

On Petition for Rehearing.

PER CURIAM.

█ In our opinion, we treated the 1938 amendment as to the effectiveness of the Commission's orders as an amendment of the Clayton Act, 38 Stat. 730. In fact, it merely amended the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq. We must, therefore, hold that the order of the Federal Trade Commission was correctly excluded. Cf. Proper v. John Bene & Sons, D.C., 295 F. 729. Accordingly, the trial judge's finding that Brunswick had not violated the Clayton Act must be affirmed.[1]

█ The court below denied costs to either side. On appeal, Brunswick has prevailed on the Clayton Act and trademark issues; American has prevailed on the question of the validity of the patent. We think it appropriate, therefore, that neither side be awarded the costs of the appeal and that the district judge's decision as to costs in the court below be affirmed.

---

[1] That portion of our previous opinion as to violations of the Clayton Act is accordingly withdrawn.