**NEW JERSEY WOOD FINISHING COM-PANY, Plaintiff-Appellee,**

v.

**MINNESOTA MINING AND MANUFAC-TURING COMPANY, Defendant-Appel-lant, and Essex Wire Corp., Defendant.**

**No. 14487.**

United States Court of Appeals Third Circuit.

Argued Dec. 10, 1963.

Decided May 20, 1964.

Sidney P. Howell, Jr., New York City (Charles C. Trelease, Newark, N. J., Edwin E. McAmis, Regan, Goldfarb, Powell & Quinn, New York City, Thomas J. Lyons, St. Paul, Minn., of counsel, on the brief), for defendant-appellant.

Albert G. Besser, Newark, N. J. (Hannoch, Weisman, Myers, Stern & Besser, Newark, N. J., Ralph M. Lowenbach, Newark, N. J., on the brief), for plaintiff-appellee.

Before BIGGS, Chief Judge, and McLAUGHLIN and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

This is an interlocutory appeal under 28 U.S.C. § 1292(b) from a denial of a defense motion to dismiss based on the statute of limitations.

Plaintiff-appellee is the New Jersey Wood Finishing Company (N. J. Wood),

a New Jersey corporation engaged in the manufacture of certain electrical insulation products. Defendant-appellant is the Minnesota Mining and Manufacturing Company (3M), a Delaware Corporation, doing business in New Jersey and likewise engaged in the electrical insulation field.

On June 24, 1960, the Federal Trade Commission (FTC) had issued a complaint against 3M, charging that 3M "has violated and is now violating the provisions of Section 7 of the Clayton Act (U.S.C. Title 15, Section 18) as amended, * * *." That FTC complaint substantially alleged the following:

For a number of years prior to 1953, 3M was a highly diversified company, manufacturing and selling a number of product lines and segments thereof. From 1952 to 1956, 3M began to acquire the operations of a number of manufacturers and various product groups, particularly in the electrical insulation field. During this period it also bought several distributor companies. In March 1956, 3M absorbed Prehler Companies, the second largest distributor (15% of sales) of electrical insulation products in the United States, and in August 1956, it absorbed Insulation and Wires, Inc. (IWI), the third largest such distributor (14% of sales). After obtaining these corporations, 3M became the largest such distributor, having around 29% of the total sales of electrical insulation prod-

ucts sold and distributed by electrical instrument distributors in the United States.

By these acquisitions, 3M further became the second largest distributor of seven (7) of the electrical insulation products it manufactured and had 18% of the total sales of these products. In 1958 3M's sales of these products through its acquired distributors, increased to about 21% of the total sales of said products, while the sale of those seven products by the largest electrical insulation distributor decreased to less than 21%.

By virtue of 3M's acquisition of these distributor corporations, other manufacturers who had previously dealt with Prehler and IWI found this market closed to them. Similarly other distributors, who had been supplied with products by 3M and the other manufacturers 3M acquired, found this source of supply cut off.

The FTC complaint asserted that the effect of the acquisitions of Prehler and IWI, and of each of them, by 3M may be substantially to lessen competition or to tend to create a monopoly in the manufacture, distribution, and sale of electrical insulation products, individually and collectively in various sections of the country within the meaning of Section 7 of the Clayton Act as amended. The complaint thereafter specified these injurious effects.[1]

1. The aforesaid effects include the actual or potential lessening of competition and a tendency to create a monopoly in the following ways, among others:

1. Minnesota Mining, as the largest producer of electrical insulation tape, and with its acquisitions of leading manufacturers of other electrical insulation products, by acquiring two of the three largest distributors of electrical insulation products in the United States has extended and integrated its business in such a manner as to substantially increase its position in the manufacture, sale and distribution of electrical insulation products; and it may exercise the inherent powers of its acquired position to substantially lessen competition or tend to create a monopoly in the manufacture, sale and distribution of electrical insulation products.

2. Manufacturers of electrical insulation products have been foreclosed from a substantial share of the markets for said products.

3. Competition has been eliminated between Prehler and IWI in the distribution and sale of electrical insulation products in the sections of the country in which they were competing, and potential competition has been eliminated between said companies throughout the United States.

4. Actual and potential competition has been eliminated between Minnesota Mining and the two acquired distributors.

5. As a leading manufacturer and distributor of electrical insulation prod-

The FTC complaint concluded by charging that:

"The foregoing acquisitions, acts and practices of respondent, * * * constitute a violation of Section 7 of the Clayton Act as amended and approved December 29, 1950:

"WHEREFORE, THE PREMISES CONSIDERED, the Federal Trade Commission on this 24th day of June, A.D. 1960 issues its complaint against said respondent."

Apparently before any testimony was taken, this FTC proceeding was terminated by consent order entered July 20, 1961, under which 3M was ordered inter alia to divest itself absolutely of all the assets of Insulation and Wires Division (IWI) of the Essex Wire Corporation and its related corporations.

On November 20, 1961, N. J. Wood filed its complaint in this action alleging that 3M had violated Section 1 and Section 2 of the Sherman Act (15 U.S.C. §§ 1, 2 (1958)) and Section 7 of the Clayton Act (15 U.S.C. § 18 (1958)) to its (N. J. Wood's) injury, for which under Section 4 of the Clayton Act (15 U.S.C. § 15 (1958)) it was entitled to treble damages. N. J. Wood claimed that 3M had acquired IWI in violation of these antitrust statutes and deprived it of a substantial national market for its products.

3M moved to strike N. J. Wood's complaint because the cause of action accrued more than four years before the commencement of the suit and was therefore barred by the statute of limitations. N. J. Wood opposed the motion, arguing that the statute was tolled under 5(b) of the Clayton Act by virtue of the FTC proceeding against 3M.

On March 19, 1963, an amended complaint was filed by direction of the court. Its gravamen is the same as are the controlling legal questions.

On the motion, the trial judge held that the proceeding by the FTC to enforce Section 7 of the Clayton Act was a "civil or criminal proceeding * * * instituted by the United States" within the meaning of Section 5 of the Clayton Act (15 U.S.C. § 16 (1958));[2] that the statute of limitations was therefore tolled and plaintiff's filing of the complaint in this cause against 3M was timely. New Jersey Wood Finishing Company

ucts Minnesota Mining has acquired a position whereby it may:

(a) Manipulate prices or use other means to lessen competition or tend to create a monopoly; and

(b) Concentrate the full impact of its sales, promotional and merchandising experience and ability on one of its electrical insulation products, or on one selected section of the country.

(6) Concentration of the manufacture, sale and distribution of electrical insulation products may be increased.

2. The first paragraph of Section 5 (now 5(a) (15 U.S.C. § 16(a)) provides:

"A final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws or by the United States under section 4A, as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: *Provided*, That this section shall not apply to consent judgments or decrees entered before any testimony has been taken or to judgments or decrees entered in actions under section 4A."

The second paragraph of Section 5 (now 5(b)) (15 U.S.C. § 16(b)) provides:

"Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, * * * the running of the statute of limitations in respect of every private right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter: *Provided, however*, That whenever the running of the statute of limitations in respect of a cause of action arising under section 4 is suspended hereunder, any action to enforce such cause of action shall be forever barred unless commenced either within the period of suspension or within four years after the cause of action accrued."

v. Minnesota Mining & Manufacturing Company, 216 F.Supp. 507 (D.C.N.J. 1963).

■ N. J. Wood's claim arises in the first instance under Section 4 of the Clayton Act, which provides that "persons" injured by violations "of the antitrust laws" shall be entitled to threefold damages. 15 U.S.C. § 15 (1958) "Antitrust laws" as that term is employed in Section 4 has a restricted meaning. Notwithstanding other antitrust acts prior or subsequent to the Clayton Act, private parties can recover under Section 4, only where their injury has resulted from acts in violation of the specific antitrust laws, itemized in Section 1 of the Act.[3] 15 U.S.C. § 12 (1958); Nashville Milk Co. v. Carnation Co., 355 U.S. 373, 78 S.Ct. 352, 2 L.Ed.2d 340 (1958). The Sherman and Clayton Acts upon violations of which N. J. Wood's complaint is based, are "antitrust laws" within the meaning of Section 4. Other acts are not, including for our purposes, the Federal Trade Commission Act. See Samson Crane Co. v. Union National Sales, 87 F.Supp. 218 (D.C.Mass.1949).

In its scheme for the enforcement of these "antitrust laws", Congress envisaged both public and private actions. United States v. Borden Co., 347 U.S. 514, 519, 74 S.Ct. 703, 98 L.Ed. 903 (1954); United States v. Cooper Corp., 312 U.S. 600, 608, 610, 61 S.Ct. 741, 85 L.Ed. 1071 (1941); United States v. Bendix Home Appliances, 10 F.R.D. 73, 77 (S.D.N.Y. 1949); see 2 Toulmin's Antitrust Laws, Section 16.6 P. 91 (1949); MacIntyre, The Role of the Private Litigant in Antitrust Enforcement, 7 Antitrust Bulletin, P. 113, et seq. (1962). Through Section 4, the business public became an ally of government and the private antitrust suit, a substantial weapon of national antitrust policy. Cinnamon v. Abner A. Wolf, Inc., 215 F.Supp. 833, 834 (E.D.Mich.1963), citing Report of the Attorney General's National Committee to Study the Antitrust Laws, P. 378 (1955). Congress had hoped that these private antitrust suits would supplement government actions and perhaps in some cases make them unnecessary.[4]

This broad plan of private and public actions is further detailed. The Sherman Act[5] contemplates civil (Section

---

3. These "antitrust laws" are: The Sherman Act (Act of July 2, 1890, c. 647, 26 Stat. 209); The Clayton Act (Act of October 15, 1914, c. 323, 38 Stat. 730); and the Wilson Tariff Act (Act of August 27, 1894, c. 349, Section 73–77, 28 Stat. 57 as amended Act of February 12, 1913, c. 40, 37 Stat. 667).

4. "At the time of enactment of the Sherman Act, the major emphasis was upon methods of enforcement, and it was believed that the most effective method, in addition to the imposition of penalties by the United States, was to provide for private treble damage suits. It was originally hoped that this would encourage private litigants to bear a considerable amount of the burden and expense of enforcement and thus save the Government time and money.

"The enactment of the Clayton Act, in 1914 was in part a recognition by the Congress that section 7 of the Sherman Act had not successfully stimulated private litigation for enforcement of the Sherman Act. * * *

"Since the enactment of the Clayton Act, the bulk of private antitrust litiga-

tion has followed successful Government action, so that the judgments and decrees in the Federal proceedings could be used to establish a case. Amassing evidence (sic) for antitrust cases would otherwise be a prohibitively expensive task for most plaintiffs." S.Rep. No. 619, 84 Cong., 1st Sess. June 21, 1955; U.S.Code Cong. & Ad.News, p. 2329 (1955).

5. The Sherman Act was the first piece of Federal Antitrust legislation. Passed in 1890, the act sought to protect commerce against unlawful restraints and monopolies, and preserve freedom of competition. Act of July 2, 1890, c. 647, 26 Stat. 209. Standard Oil of New Jersey v. United States, 221 U.S. 1, 50, 52, 31 S.Ct. 502, 55 L.Ed. 619 (1911). The era in which it was enacted was one "of trusts" and " 'combinations' of businesses and of capital organized and directed to control of the market by suppression of competition in the marketing of goods and services, the monopolistic tendency of which had become a matter of public concern." Apex Hosiery Co. v. Leader, 310 U.S. 469, 491–493, 60 S.Ct. 982, 992, 84 L.Ed. 1311 (1940). The Sherman Act was

4) and criminal (Section 3) actions by the Justice Department, and treble damage suits by private parties (Section 7). 15 U.S.C. §§ 3, 4, 15 note (1958); but cf. Federal Trade Commission v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948). Under the Clayton Act,[6] private actions may be in the form of suits for injunctive relief (Section 16) or for treble damages (Section 4). 15 U.S.C. §§ 26, 15 (1958); public actions, in the form of suits principally by the FTC and the Justice Department under Section 11 for violations of Sections 2, 3, 7 and 8 of that act. 15 U.S.C. § 21 (1958).

To be distinguished is the role of the FTC under the FTC Act.

The Federal Trade Commission was established under the Federal Trade Commission Act (Act of September 26, 1914, c. 311, 38 Stat. 717) and invested with both adjudicatory and investigatory functions. Under Section 5 (of the FTC Act) the FTC was empowered to order the discontinuance of "unfair methods of competition" and later "unfair * * practices" which were declared "unlawful" by the Act. See the extensive legislative history in Judge Denison's partial dissent in L. B. Silver Co. v. Federal Trade Commission, 289 F. 985, 992–998 (6 Cir. 1923); Federal Trade Commission v. Klesner, 280 U.S. 19, 50 S.Ct. 1, 74 L.Ed. 138 (1929); Federal Trade

Commission v. Raladam Co., 283 U.S. 643, 647, 51 S.Ct. 587, 75 L.Ed. 1324 (1931). Purposefully left broad and generally undefined (as to what constituted an "unfair method of competition" or an "unfair practice"), Section 5 proceeded on the idea of an administrative body of experts (the FTC) which, given a flexible standard of judgment, would discover and prevent the use of such practice before it worked a Sherman violation. See Federal Trade Commission v. Motion Picture Advertising Service Co., 344 U.S. 392, 394, 73 S.Ct. 361, 97 L.Ed. 426 (1953); Federal Trade Commission v. Raladam Co., 283 U.S. 643, 648, 51 S.Ct. 587, 75 L.Ed. 1324 (1931); see Beer, Federal Trade Law and Practice (1942) P. 76–77. The Sherman Act was to serve as a guide for the Commission, as a "declaration of policy", to be considered in determining what constituted an unfair method of competition. Federal Trade Commission v. Beech Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922); Standard Oil Co. v. Federal Trade Commission, 282 F. 81, 86–87 (3 Cir. 1922) affirmed 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746 (1923).

Within this area of "unfair methods of competition", the FTC Act and the Clayton Act overlap. At the time of the enactment of the Clayton Act, it was believed that its specific prohibitions particularly Section 2 and Section 3 (15 U.S.C. §§ 13, 14 (1958)) would be cov-

---

not only an immediate legislative answer to this threat, but a declaration of policy as well. It was basically a criminal statute, but Section 4 of that act also provided for enforcement by civil actions by the Justice Department through the various United States Attorneys. Section 7 also gave a private right of action for treble damages. This latter section was for practical purposes absorbed in Section 4 of the Clayton Act of 1914, but its repeal was not pronounced until 1955. Act of July 7, 1955, c. 283, § 3, 69 Stat. 283.

6. The Sherman Act applied solely to consummated contracts and conspiracies. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 58, 31 S.Ct. 502, 55 L.Ed. 619 (1911); Standard Fashion Co. v. Magrane-Houston Co., 258 U.S.

346, 355, 46 S.Ct. 360, 66 L.Ed. 653 (1922). In 1914, Congress enacted the Clayton Act which sought to reach certain specific practices, considered dangerous to free competition in commerce and trade, but not covered by the Sherman Act, Act of October 15, 1914, c. 323, 38 Stat. 730. Standard Fashion Company v. Magrane-Houston Co., 258 U.S. 346, 356, 46 S.Ct. 360, 66 L.Ed. 653 (1922); Corn Products Refining Co. v. Federal Trade Commission, 324 U.S. 726, 738, 65 S.Ct. 961, 89 L.Ed. 1320 (1945). It was thought that by making these practices illegal, the creation of trusts, conspiracies and monopolies would be arrested in their inception. See United States v. United Shoe Machinery Co., 264 F. 138, 162 (E.D.Mo.1920), quoting the report of the Senate Committee.

ered by Section 5 of the FTC Act. However, Congress, by declaring these practices unlawful specifically in the Clayton Act, took away from the Commission its informed judgment respecting them.[7] These "unfair methods of competition (later amended to include "unfair * * * practices"), whether prohibited specifically under the Clayton Act, or generally under the FTC Act, were to be restrained according to a congressional design. While Section 5 of the FTC Act was to be enforced by the FTC, Section 11 of the Clayton Act provided a scheme of dual enforcement of Sections 2, 3, 7 and 8 of that act, by the FTC and the Justice Department; and while the underlying substantive violation of Section 5 (FTC Act) did not give rise to a private right of action (the FTC Act was not an antitrust law within the meaning of Clayton Section 4), a violation of Sections 2, 3, 7 and 8 did, no matter by which agency, if either of them, they were enforced. In short, the FTC Act bolstered the Clayton and Sherman Acts both by restraining evils, which might also constitute violations of those acts, and by reaching areas not covered by their proscriptions. These three acts are "interlaced" remedially as well as substantively evincing a Congressional desire for a "cumulative remedy" for the threats and dangers to trade and competition. See Federal Trade Commission v. Cement Institute, 333 U.S. 683, 694–695, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); United States v. Borden Company, 347 U.S. 514, 518, 74 S.Ct. 703, 98 L.Ed. 903 (1954). 51 Cong.Rec. 16274–16275 (1914). The question here presented concerns in part the "cumulative remedy" Congress provided for the violation of Section 7 of the Clayton Act. In the case at bar, both the FTC (under Section 11) and N. J. Wood (under Section 4)

had brought actions based on the violation of Section 7. N. J. Wood claims that, by virtue of the FTC proceeding, it is entitled to the benefits of Section 5 of the Clayton Act. Section 5 is auxiliary to Section 4 and provides for the tolling of the statute of limitations in favor of potential private suitors during the pendency of certain government antitrust suits. 3M, however, contends that the FTC proceeding is not a proceeding instituted by the United States within the meaning of Section 5.

As we indicated above, specifically granted in Section 11 of the Clayton Act, (15 U.S.C. § 21 (1958)), was the jurisdiction of the FTC to enforce compliance with Sections 2, 3, 7 and 8 of the Act, (15 U.S.C. §§ 13, 14, 18, 19 (1958)) to be shared concurrently with the Justice Department. (See footnote 12 infra). United States v. W. T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); Standard Oil Co. of Calif. v. United States, 337 U.S. 293, 310, 69 S.Ct. 1051, 93 L.Ed. 1371 (Note 13) (1949); United States Alkali Export Association, Inc. v. United States, 325 U.S. 196, 65 S.Ct. 1120, 89 L.Ed. 1554 (1945). In the latter opinion, 325 U.S. at pp. 206–209, 65 S.Ct. 1120, 89 L.Ed. 1554 Chief Justice Stone described the enforcement of these provisions as one of "efficient cooperation" between the "two agencies". This relationship was further cemented in 1950 when Congress amended Section 11, giving the Attorney General the right to intervene in an FTC Clayton Act proceeding. Act of December 29, 1950, c. 1184, 64 Stat. 1125; House Report No. 1191, August 4, 1949, 81st Cong. 1st Session; S. Report No. 1775, June 2, 1950, 81st Cong. 2d Session, U.S.Code Congressional Service, p. 4293. See also Final Report of Attorney General's Na-

---

7. From the House version of the Clayton bill (H.R. 15657) the Senate Committee had stricken what eventually became Sections 2 and 3 of the Act because it felt that these "unfair methods of competition" would be covered by Section 5 of the FTC Act. A long debate ensued in the Senate. See 51 Cong.Rec. 13963,

14088–14100; 14200–14229; 14249–14276 (1914). Finally the Senate voted to restore them to the Clayton bill, mainly for the reasons stated by Senator Clapp: to declare these practices unlawful specifically and withdraw them from the judgment of the commission, 51 Cong.Rec. 14257 (1914).

tional Committee to study Antitrust Laws, G.P.O. March 1955 at P. 375, et seq. We believe that when Congress vested authority in the FTC to enforce the Clayton Act provisions, it designated the FTC as a "representative of the United States" having "authority to represent its interest in a final adjudication" of an alleged Clayton antitrust violation. Sunshine Anthracite Coal Co. v. Atkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940); United States v. Willard Tablet Co., 141 F.2d 141, 152 A.L.R. 1194 (7 Cir. 1944); United States v. R. C. A., 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959). In the latter case, the Supreme Court held that because the Federal Communications Commission (FCC) had not the power and authority to decide the antitrust issue there presented, the United States would not be estopped by any determination made therein. Underwritten in that decision is the thought that if the FCC had the power and authority to decide those antitrust issues, FCC would have been regarded in that instance as a representative of the United States.[8] R. C. A. case, supra, 358 U.S. p. 352, 79 S.Ct. 457, 3 L.Ed.2d 354. This clearly negates the proposition offered by 3M in this appeal, that suits by the United States and proceedings by the FTC must be regarded as distinct, because "agency determinations do not bar antitrust suits". The cases cited by 3M[9] deal fundamentally with questions of primary jurisdiction over matters having antitrust implications. They hold merely that agency determinations in proceedings brought in regulation of other laws (e. g., Interstate Commerce Act, Natural Gas Act) without authority to adjudicate antitrust issues

will not bar antitrust suits by the United States. Cf. Pan American World Airways v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963). In the FTC proceeding at issue, where the Commission under Section 11 was directly given such authority to enforce the Clayton Act, such action must be regarded as one on behalf of the United States, the interests of which are now further protected by Attorney General's right of intervention.

Any argument that an FTC proceeding is not a suit by the United States must meet the reality that whether the Commission functions under the Clayton or the FTC Act, it does so in the public interest and as an administrative arm of the Government. See 16 C.F.R. Section 1.21 Rules of Practice of the Federal Trade Commission; Federal Trade Commission v. Cement Institute, 333 U.S. 683, 692–693, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); Federal Trade Commission v. Gratz, 253 U.S. 421, 432, 435, 40 S.Ct. 572, 64 L.Ed. 993 (1920), Justice Brandeis dissenting but not as to the functioning of the Commission; certainly an FTC proceeding under Section 11 of the Clayton Act should not be rendered an anomaly in the Congressional plan for "antitrust law" enforcement. This plan definitely contemplates private and public actions, with some of these public actions, being brought by the FTC under Section 11. As Judge Augelli succinctly phrased it below:

"It certainly would seem not to have been the Congressional intent to have plaintiff's rights turn on the fortuitous circumstance of which agency initiated the action. To permit a plaintiff to take advantage of facts

---

8. We do not consider that Section 11(e) of the Clayton Act or the case of United States v. W. T. Grant, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) compels the conclusion that both the FTC and the Justice Department can bring separate proceedings against a single defendant for the same alleged violation under Section 11. Rather Section 11(e) would seem to indicate that a suit by the FTC under Section 11 should

not work to relieve a defendant from a private antitrust suit. 15 U.S.C. § 21 (e) (1958). See 51 Cong.Rec. 16274 (1914).

9. Georgia v. Pennsylvania R. Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945); United States v. Borden Co., 308 U.S. 188, 74 S.Ct. 703, 98 L.Ed. 903 (1939); California v. Federal Power Commission, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962).

uncovered as a result of a Department of Justice proceeding, but not as a result of a Federal Trade Commission proceeding brought under the same statute, does not seem logical." New Jersey Wood Finishing Co. v. Minnesota Mining and Manufacturing Co., 216 F.Supp. 507, 510 (D.C.N.J.1963).

■ The sole reason for Section 5 of the Clayton Act was to stimulate private antitrust suits (see footnote 4) and aid such private suitors. As it appears that the FTC is the primary enforcing agency of Section 7 of the Clayton Act (see United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963)),[10] to hold that such a proceeding was not within Section 5 (b) would thwart in part the Congressional scheme for the enforcement of Section 7. We think it must follow that a Section 4 private right is preserved by

a Government action to enforce Section 7, whether that action is brought by the Justice Department or the FTC; that it is not a question whether it is a judicial or an administrative proceeding but rather whether it is a proceeding on behalf of the United States to enforce the "antitrust laws".

It is also asserted that an action by the FTC is not a "proceeding in equity", as Section 5 originally provided.[11] Certainly, when the Justice Department seeks an injunction against a defendant for violation of the Clayton Act, its purpose is to prevent irreparable injury to the public weal by the traditional equitable remedy. Section 15 of the Clayton Act, 15 U.S.C. § 25 (1958); United States v. Borden Co., 347 U.S. 514, 518, 74 S.Ct. 703, 98 L.Ed. 903 (1954). The effect of the FTC proceeding is essentially the same, by virtue of the 1959 amendment to Section 11, hereinafter referred to as the Finality Act of 1959.[12] Act of July

10. Opinion by Mr. Justice Brennan at 374 U.S. p. 346, 83 S.Ct. p. 1732, 10 L.Ed.2d 915.

"The legislative history shows that the objective of including the phrase 'corporation subject to the jurisdiction of the Federal Trade Commission' in § 7 was not to limit the amalgamations to be covered by the amended statute but to make explicit the role of the FTC in administering the section. The predominant focus of the hearings, debates, and committee reports was upon the powers of the FTC * * * Furthermore, although the Clayton Act has always provided for dual enforcement by court and agency (cites), prior to the 1950 amendment enforcement of § 7 was left largely to the FTC. Martin, Mergers and the Clayton Act (1959), 205, 219; Montague, The Cellar Anti-Merger Act: An Administrative Problem in an Economic Crisis, 37 A.B. A.J. 253 (1951). And the impetus to amend § 7 came in large part from the FTC (cites). Congress in 1950 clearly intended to remove all question concerning the FTC's remedial power over corporate acquisitions, and therefore explicitly enlarge the FTC's jurisdiction." See also Mr. Justice Harlan's dissent 374 U.S. at p. 392, 83 S.Ct. 1715, 10 L.Ed.2d 915, supra.

11. See footnote 2. Section 5 now reads "civil * * * proceeding" instead of "suit or proceeding in equity".

12. Section 11 provides:
"(a) That authority to enforce compliance with sections two, three, seven and eight of this Act by the persons respectively subject thereto is hereby vested: * * * in the Federal Trade Commission where applicable to all other character of commerce, to be exercised as follows:
"(b) Whenever the commission or board vested with jurisdiction thereof shall have reason to believe that any person is violating or has violated any of the provisions of sections two, three, seven and eight of this Act, it shall issue and serve upon such person [and the Attorney General (amended Dec. 29, 1950, c. 1184, 64 Stat. 1125)] a complaint stating its charges in that respect, and containing a notice of a hearing * * *. The person so complained of shall have the right to appear * * * and show cause why an order should not be entered by the commission or board requiring such person to cease and desist from the violation of the law so charged in said complaint. [The Attorney General shall have the right to intervene and appear in said proceeding (amended, 64 Stat. 1125)].

23, 1959, Pub-L 86–107, Section 1, 73 Stat. 243. Formerly the FTC had to seek the enforcement of its order—after its determination of a Clayton Act violation, and a subsequent violation of the order (See Federal Trade Commission v. Ruberoid Co., 343 U.S. 470, 72 S.Ct. 800, 96 L.Ed. 1081 (1952))—by a petition to the Court of Appeals; but now enforcement decrees by the Circuit Court of Appeals are unnecessary and the orders become final and self-executing by the expiration of defendant's time to seek review.

The legislative history of the FTC Act and the Clayton Act indicates that the FTC cease and desist order originally was to be more in the nature of "notice" of violation than an injunctive measure. The bare order had "no effect in itself, unless made operative by the Circuit Court of Appeals, * * *." Proper v. John Bene and Sons, Inc.,

295 F. 729, 731 (E.D.N.Y.1923). The FTC functioned as an investigatory body which would judge and note violations of the Acts. In formulating its findings and order, it presented itself in a manner analogous to a Master in Equity to the Court of Appeals [See address of William H. Taft, of October 20, 1914, reported in New York Times, October 21, 1914, P. 5] which sat not as an Appellate Court but as a court of equity enforcing, modifying or setting aside the orders of the FTC. C. E. Niehoff & Co. v. Federal Trade Commission, 241 F.2d 37, 42 (7 Cir. 1957); Federal Trade Commission v. Fairyfoot Products Co., 94 F.2d 844 (7 Cir. 1938); Butterick v. Federal Trade Commission, 4 F.2d 910 (2 Cir. 1925); L. B. Silver v. Federal Trade Commission, 292 F. 752, 753 (6 Cir. 1923). See e. g. 51 Cong.Rec.14927, 14768–70, 14251–52, 16281 (1914), H. Rep.No. 1142, 63 Cong. 2d Sess. p. 19;

* * * If upon such hearing the commission or board, as the case may be, shall be of the opinion that any of the provisions of said sections have been or are being violated, it shall make a report in writing in which it shall state its findings as to the facts, and shall issue and cause to be served on such person an order requiring such person to cease and desist from such violations, * * *.

"(c) (as amended by the Finality Act of 1959, 73 Stat. 243). Any person required by such order of the commission or board to cease and desist from any such violation may obtain a review of such order in the court of appeals of the United States * * * by filing in the court * * * a written petition praying that the order of the commission or board be set aside. * * * Upon such filing of the petition the court * * * shall have power to make and enter a decree affirming, modifying, or setting aside the order of the commission or board, and enforcing the same to the extent that such order is affirmed, * * * To the extent that the order of the commission or board is affirmed, the court shall issue its own order commanding obedience to the terms of such order of the commission or board. * * * The judgment and decree of the court shall be final, except that the same shall be sub-

ject to review by the Supreme Court upon certiorari * * *.

"(d) Upon the filing of the record with it the jurisdiction of the court of appeals to affirm, enforce, modify, or set aside orders of the commission or board shall be exclusive.

"(e) * * * No order of the commission or board or judgment of the court to enforce the same shall in anywise relieve or absolve any person from any liability under the antitrust laws.

"(f) * * *

"(g) Any order issued under subsection (b) shall become final—

"(1) upon the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time; * * *

"(2) * * *

"(3) * * *

"(4) * * *

"(h) * * *

"(i) * * *

"(j) * * *

"(k) * * *

"(*l*) Any person who violates any order issued by the commission or board under subsection (b) after such order has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $5,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the United States. * * * *"

Henderson, Federal Trade Commission (1924) pp. 77–78. In addition to examining the prospective application of the order, restraining the violation of the Act, the Court of Appeals had to determine the legality of the order, whether the facts properly found by the FTC constituted a violation of the Act. See Federal Trade Commission v. Henry Broch and Co., 368 U.S. 360, 364, 82 S. Ct. 431, 7 L.Ed.2d 353 (1962); Federal Trade Commission v. Ruberoid Co., 343 U.S. 470, 473–474, 72 S.Ct. 800, 96 L.Ed. 1081 (1952); Jacob Siegel Co. v. Federal Trade Commission, 327 U.S. 608, 612, 66 S.Ct. 758, 90 L.Ed. 888 (1946); Federal Trade Commission v. Fairyfoot Products Co., 94 F.2d 844 (7 Cir. 1938); See Beer, supra p. 420. By virtue of the Finality Act, if judicial review is not sought, the cease and desist order becomes final, and an adjudication that a violation of the Clayton Act has been committed. That act brought to Clayton Act-FTC orders the same binding effect that had been given FTC orders under the FTC Act. See Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 54, 68 S.Ct. 822, 92 L.Ed. 1196 (1948); United States v. Willard Tablet Co., 141 F.2d 141, 143 (7 Cir. 1944); George H. Lee Co. v. Federal Trade Commission, 113 F.2d 583 (8 Cir. 1940); United States v. Piuma, 40 F. Supp. 119 (S.D.Calif.1941); affirmed 126 F.2d 601 (9 Cir. 1942); See 152 ALR Anno. 1198 (1944).

The "proceeding in equity" therefore was not the Commission proceeding but the proceeding before the Court of Appeals from which a judgment or decree would issue determining and restraining a violation of the Act. With development of "final orders" in FTC proceedings, whether the order becomes final by expiration of time in which to seek review or by a judgment or decree from a Court of Appeals, the proceeding resulting in such final order or decree, is a "proceeding in equity" and a "civil proceeding" within the meaning of Section 5, and an adjudication of a violation of the Clayton Act.

The vital effect of these changes is overlooked by appellant in its strong reliance upon the 1923 decision in Proper v. John Bene and Sons, Inc., 295 F. 729 (E.D.N.Y.1923). That opinion held that a FTC proceeding under the FTC Act is not a "proceeding in equity * * * instituted by the United States" to restrain violations of the "antitrust laws" within Section 5 of Clayton Act. In Proper, the plaintiff brought a private antitrust suit for treble damages for violations of the Clayton, Sherman and FTC Acts. A proceeding had been brought against the defendant by the FTC under the FTC Act and the plaintiff sought to have the bare FTC order, unenforced by the courts, admitted as prima facie evidence under Section 5.

The court denied it for several reasons: that the proceeding before the Commission was not a "proceeding in equity"; that the FTC order was not a "final judgment or decree"; that the proceeding by the FTC to enforce Section 5 of the FTC Act was not a suit under the antitrust laws as that term is used in Section 5 of the Clayton Act. There are no findings in Proper contrary to our conception of the law as it stood in 1923. The Court in Proper dealt with a 1923 FTC proceeding under the FTC Act. We have before us a proceeding under the Clayton Act brought by an expanded 1960 FTC.

With that thoroughly in mind, the 1945 decision of Brunswick-Balke Collender Co. v. American Bowling and Billiard Corp., 150 F.2d 69 (2 Cir. 1945) cited by Judge Augelli below, becomes far more reflective of the problem presented by this appeal. There the Court held that an FTC proceeding brought for violations of Section 3 of the Clayton Act was a "final judgment or decree" rendered in a "suit or proceeding in equity brought by or on behalf of the United States" within Section 5 of the Act. In so deciding, the Court had mistaken the scope of the Act of March 21, 1938, c. 49, 52 Stat. 111, 15 U.S.C. § 45 (1958). That statute did not amend Section 11 of the Clayton Act but only Section 5 of

the FTC Act, and on rehearing the Court reversed itself, concluding that because the order was not "final", it was inadmissible as prima facie evidence under Clayton Section 5, citing Proper v. John Bene & Sons, Inc., supra. It is obvious that if the order had been final, as it is today, (by virtue of the Finality Act), the Court would have regarded the "final order" admissible under Section 5. See Fifth & Walnut v. Loew's Inc., 176 F.2d 587, 593 (footnote 9) (2 Cir. 1949).

■ 3M has argued that Section 5(b) (the tolling provision) is dependent upon Section 5(a) (the prima facie evidence provision), and that the two subsections must be construed as a unit. One theory advanced is that the express statement in Section 5(a): That this section shall not apply to "consent judgments or decrees" should be brought down to Section 5(b) and interpreted so as to prevent the tolling of the statute of limitations where the civil or criminal proceeding is terminated by a consent order. Apart from the legislative history which negates such construction 51 Cong.Rec. 15825–15826; 16046–47; 16276 (1914), it would seem that if the proviso were to apply to both paragraphs, there would be no reason to insert it after the first. As the district court further pointed out: "The proviso is grammatically a part of the single sentence which comprises section 5(a), separated only by a colon." See Flora v. United States, 362 U.S. 145, 150, 80 S.Ct. 630, 4 L.Ed.2d 623 (1960). More important is the substantive application of the consent judgment proviso. While the proviso deals with the termination of the government suit, the tolling provision operates during its "pendency". Section 5(a) permits the use of government judgments and decrees as prima facie evidence, only as to matters actually decided in the government suit. Emich Motors Corp. v. General Motors, 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534 (1951). 5(b) tolls the statute of limitations as to "matters complained of" whether or not they are actually decided. Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561 (10 Cir. 1962). To construe this section as appellant desires, would be to force every private antitrust claimant caught between the running of the statute and the possible consent termination of the government proceeding, to start suit without the benefits of the government action. See Twin Ports Oil Co. v. Pure Oil Co., 26 F.Supp. 366, 372–376 (D.C. Minn.1939), affirmed on other grounds, 119 F.2d 747 (8 Cir. 1941); Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 194 F.2d 846 (8 Cir. 1952).

The defendant 3M also suggests that proceedings which cannot yield judgments and decrees applicable as prima facie evidence under Section 5(a) cannot toll the statute of limitations under Section 5(b). The legislative history is sparse on the interrelationship between the two sections. The only clear Congressional commentary on this point occurred in the debates on the House Clayton bill, (51 Cong.Rec. 9165, 9488–90 (1914)), which had no provision for the enforcement of its sections by the FTC; [See H.Rep.No. 627, 63 Cong. 2d Sess. (1914)]; so that the question whether FTC proceedings to enforce the Clayton provisions tolled the statute of limitations was not squarely met by the 1914 legislators. The House debates support 3M's view solely to the extent that the tolling provision was to enable the private claimant to reap the benefits of the government action, i. e., the use of a government judgment and decree as prima facie evidence. Union Carbide & Carbon Corp. v. Nisely, 300 F.2d 561 (10 Cir. 1962). But see 51 Cong.Rec. 16003 (1914). In addition to the decisions noted infra (see footnote 14, infra), other courts have regarded the two subsections as related and dependent. See Sun Theatre v. R. K. O. Radio Pictures, 213 F.2d 284, 289–293 (7 Cir. 1951); Momand v. Universal Film Exchange, 43 F.Supp. 996, 1012 (D.C.Mass.1942), affirmed 172 F.2d 37 (1 Cir. 1948). However, we see no reason why final FTC orders enforcing the Clayton Act should not be admitted as prima facie evidence under Section 5(a). Brunswick-Balke Collender

358

Co. v. American Bowling and Billiard Corp., 150 F.2d 69 (2 Cir. 1945). But cf. United States v. United Shoe Machinery Corp., 89 F.Supp. 349, 356 (D.C. Mass.1950). (Final disposition of case 110 F.Supp. 295 (D.C.Mass.1953), affirmed per curiam 346 U.S. 894, 74 S.Ct. 223, 98 L.Ed. 396 (1953)). While our 1914 legislators would not have accepted a bare FTC order of that period as admissible, the finality given such order through a decree emanating from the Court of Appeals would have resulted in its being considered a "final judgment or decree", within Section 5(a). Today of course, under the Finality Act, the orders of the FTC become final adjudications of antitrust violations by expiration of the time in which review can be sought.

■ The operation of Section 5(a) has been explained to some extent by Emich Motors Corp. v. General Motors, 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534 (1951). Judgments and decrees in government suits are only prima facie evidence of antitrust violations. The defendant still has his "day in Court" on that issue. See Harrison v. Paramount Pictures, 115 F.Supp. 312 (E.D.Pa.1953), affirmed 211 F.2d 405 (3 Cir. 1954). He is entitled to offer rebuttal evidence to break down the force and effect of that prima facie evidence. 51 Cong.Rec. 13856–13858 (1914); see the authorities collected in Richfield Oil Corp. v. Karseal Corp., 271 F.2d 709, 716–727 (9 Cir. 1959). See also 65 Harv.L.Rev. 1400 (1952). 3M argues that FTC orders cannot be admitted because of the more liberal evidentiary rules of the administrative agency. This plus the broader administrative process might place the FTC proceeding on a somewhat unequal footing with a similar judicial proceeding brought by the Department of Justice. See United States v. Morton Salt Co., 338 U.S. 632, 641–643, 70 S.Ct. 357, 94 L.Ed. 401 (1950); Hunt Foods & Industries. Inc. v. Federal Trade Commission, 286 F.2d 803 (5 Cir. 1961). But see United States v. Household Goods Movers Investigation, 184 F.Supp. 689 (D.C.D.C. 1960). The differences are at most peripheral and any attack along those lines would go to the weight of the prima facie evidence, not to its propriety. The use of administrative orders as prima facie evidence in private suits is not new to our law. Under the Interstate Commerce Act, 49 U.S.C. § 16(13) (1958) a reparation order of the ICC is admissible as prima facie evidence in an action for damages by a shipper against a defendant railroad, found by the ICC to have exacted unreasonable rates.[13] Meeker

13. When the FTC bill reported out of the Senate Committee June 13, 1914 [S.Rep. No. 597, 63 Cong.2d Sess. (1914)], it reflected a desire for a Commission with the same "effective powers and usefulness as had been given the ICC." 51 Cong. Rec. 10376 (1914). The floor debates in the Senate reveal a recurring Congressional feeling for an FTC functioning like the ICC. Distinctions and similarities were consistently noted. Representative Covington said:

"There is, however, a perfect analogy between the former power of the Interstate Commerce Commission under the Cullom Act and the power of the Federal Trade Commission. Under the Cullom Act, the Interstate Commerce Commission had the power to determine whether an existing rate was unreasonable, and, if it is so found, to order the railroad to cease and desist from charging that rate.

"The Federal Trade Commission will have precisely similar power in regard to an existing method of competition. It is instructive therefore to bear in mind that the orders of the Commission under that act were not final but were subject to review by the courts." 51 Cong. Rec. 14932 (1914).

Also, in the Senate report in the Clayton Bill (S.Rep. No. 698, 63 Cong.2d Sess. 1914), the Committee recommended the change in Section 5(a) from "conclusive evidence" to "prima facie evidence". At P. 45, it drew the analogy of the use of a tax deed as evidence of title, citing Cooley in Taxation, 521, 5th Ed. 1886, and Marx v. Hanthorn, 148 U.S. 172, 183, 13 S.Ct. 508, 37 L.Ed. 410 (1893). These same thoughts are expressed in the ICC-Meeker case, supra, which cites Marx v. Hanthorn. Such Congressional thinking tends to show that the 1914 legislator would not be adverse to the use of

& Co., v. Lehigh Valley R. R., 236 U.S. 412, 430, 35 S.Ct. 328, 59 L.Ed. 644 (1915); Pennsylvania R. Co. v. Weber, 257 U.S. 85, 42 S.Ct. 18, 66 L.Ed. 141 (1921); Western Maryland Ry. v. Penn. Veneer Co., 92 F.2d 146 (3 Cir. 1937). While we are satisfied that final orders in FTC Clayton Act proceedings are admissible under Section 5(a) as prima facie evidence, in the case at bar, N. J. Wood will not get the benefit of Section 5(a) because the FTC proceeding involved ended in a consent order, apparently before any testimony was taken. We have reached this question solely because there was some evidence in the legislative history of the section that the two subsections are to be construed together, as other courts have subsequently held. However, the decision of the court below that the two subsections should not be regarded as interdependent does have substantial support.

The above mentioned intention in 1914 does not seem as plain in 1955 when Congress amended Section 5 and divided Section 5 into subsections (a) and (b). Act of July 7, 1955, c. 283, Section 2, 69 Stat. 283. The committee reports on the 1955 amendment to Section 5, plainly intimated a broader reason for tolling the statute of limitations. By 1955, the Supreme Court had pointed to the limited practical value of the prima facie evidence to a private suitor. See Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954); Partmar Corp. v. Paramount Pictures Theatres Corp., 347 U.S. 89, 102–103, 74 S.Ct. 414, 98 L.Ed. 532 (1954). The real importance of government proceedings that accrues today to private suitors is the availability to them of the government's case against the defendant. Section 5(b) enables "a plaintiff to take advantage of facts uncovered" as a result of the gov-

ernment proceedings. New Jersey Wood Finishing Co. v. Minnesota Mining & Manufacturing Co., 216 F.Supp. 507 at p. 510 (D.C.N.J.1963). In the Senate Report on the 1955 amendment to Section 5(b) the Committee wrote:

"Although the statute is tolled during the pendency of the proceedings brought by the United States, the plaintiff in a treble-damage action may find himself hard pressed to reap the benefits of the Government suit if, upon its conclusion, he has but a short time remaining to study the Government's case, estimate his own damages, assess the strength and validity of his suit, and prepare and file his complaint". Senate Report No. 619, June 21, 1955, U.S. Code Cong. & Ad.News, 84 Cong. 1st Sess. P. 2332.

 Whether or not this shift in congressional intent was there fully outlined, it seems to us that FTC orders and FTC proceedings presently enjoy the efficacy of court proceedings for purposes of Section 5, and that in this appeal the FTC proceeding against 3M to restrain a violation of Clayton Section 7, tolled the statute of limitations and that N. J. Wood's complaint was timely.

Three recent decisions [14] on the issue before us all relied on the old Proper case, supra, and summarily rejected the Brunswick Balke-Collender opinion. In so doing, those courts clearly overlooked the affirmative statutory distinction between FTC proceedings under the FTC Act and under the Clayton Act and that distinction's vital effect upon Section 4 and Section 5 of the Clayton Act; otherwise they could not have reasonably adopted the obsolete Proper rule. To do so at this stage is to consider the present question in a vacuum and simply forget all about the present governing statutory formula for the enforcement of the Clay-

affirmed FTC orders as prima facie evidence.

14. Highland Supply Corporation v. Reynolds Metals Company, 221 F.Supp. 15 (E.D.Mo.1963), reversed in part (but af-

firmed on the issue at bar) 327 F.2d 725 (8 Cir. 1964); Volasco Products Co. v. Lloyd A. Fry Roofing Company, 223 F. Supp. 712 (E.D.Tenn.1963); Farmington Dowel Products Co. v. Forster Mfg. Co., Inc., 223 F.Supp. 967 (D.C.Me.1963).

ton Act and the increased powers that have come to the FTC.

It is also clear that the status of the Brunswick-Balke opinion of Judge Frank was fundamentally misunderstood. The sound legal principle there pronounced that final FTC orders in Clayton Act proceedings are admissible within Section 5(a), was not reversed. It was simply not usable because, as was discovered, there was no Finality Act at the time, dealing with FTC-Clayton Act orders. When Congress passed the Finality Act in 1959, it simply vitalized the principle of Brunswick-Balke as to Section 5(a). We are satisfied that this principle is good law and good common sense and that its logical extension is applicable to the Section 5(b) question here involved.

Finally, 3M claims that even if the FTC proceeding tolled the statute of limitations, it preserved only the Clayton counts and the Sherman counts are barred. The statutory language of Section 5(b) tolls the statute as to "any matter complained of" in the Government suit. One of the overt acts upon which N. J. Wood's conspiracy count was based was the acquisition of IWI by 3M.[15] While "contract or conspiracy" was not at issue before the FTC, the acqusition of IWI was. N. J. Wood's complaint alleges that this act of acquisition was in furtherance of a conspiracy to restrain competition and to monopolize trade. There was a "substantial identity of subject matter." Union Carbide and Carbon Corporation v. Nisley, 300 F.2d 561, 570 (10 Cir. 1962). We, therefore hold that the acquisition of IWI was a "matter complained of" within Section 5(b) and that the statute of limitations was tolled as to the Sherman as well as the Clayton counts. Union Carbide, supra; Steiner v. 20th Century-Fox Film Corporation, 232 F.2d 190, 196 (9 Cir. 1956).

The judgment of the District Court will be affirmed.

---

15. Defendant Essex Wire is not before us on appeal, but it appears from the record that the trial judge below dismissed it with prejudice only as to the Clayton counts and not as to the Sherman counts. Though we do not decide the question, it would appear that the statute of limitations is tolled only as to named defendants in the Government suit. Sun Theatre Corp. v. R.K.O. Radio Pictures, 213 F.2d 284 (7 Cir. 1954); Momand v. Universal Film Exchanges, 172 F.2d 37 (1 Cir. 1948).